1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SUSAN PADDEN,

                    Plaintiff,

      v.

CITY OF DES MOINES, et al.,

                 Defendant.

CASE NO. 2:20-cv-00845-DGE

ORDER GRANTING
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

      This matter comes before the Court on Defendants City of Des Moines' and Michael Matthias' motions for summary judgment. (Dkt. Nos. 34, 35.)  Plaintiff Susan Padden opposes Defendants' motions. (Dkt. No. 41.)

      Having considered Defendants' motions, Plaintiff's response, Defendants' replies, the exhibits and declarations attached thereto, and the remainder of the record, the Court GRANTS Defendants' motions for summary judgment and STRIKES all other pending motions as moot.

1

## I.   FACTUAL AND PROCEDURAL BACKGROUND

2

This case stems from events that transpired as Plaintiff prepared to retire from her

3 position as Senior Services Manager for the City of Des Moines ("the City") in 2018.  Plaintiff

4 served as the Senior Services Manager for the City's Parks, Recreation, and Senior Services

5 Department ("PRSS") for more than 20 years. (Dkt. Nos. 1-1 at 3; 41-1 at 3-4; 48-1 at 3.)  For 19

6 years, Plaintiff also served on the board of the Des Moines Legacy Foundation Board ("DMLF"),

7 a 501(c)(3) non-profit organization established in 1999 to raise money to fund parks, recreation,

8 and senior facilities and services in Des Moines that the City did not cover. (Dkt. Nos. 1-1 at 3;

9 2-7 at 20-22; 2-12 at 5, 7-17, 20-24; 41-1 at 4-5.)

10

Plaintiff began considering retirement in late 2017 or early 2018, and scheduled her

11 retirement date for June 29, 2018. (Dkt. No. 48-1 at 4-6, 8.)  In preparation for her retirement,

12 Plaintiff compiled "succession notes" for her replacement as Senior Center Manager, which she

13 first distributed in draft form in April 2018. (Dkt. Nos. 36-3 at 2-15; 48-1 at 7; 48-2 at 2.)

14

Plaintiff's succession notes described her work responsibilities, the functions of her

15 department, the relationship between PRSS and other parties, and provided recommendations for

16 her successor. (Dkt. No. 36-3 at 2-15.)  Plaintiff's succession notes also described encouraging

17 donors to send donations to DMLF rather than the City. (Dkt. Nos. 36 at 2-3; 36-3 at 3-5, 10, 12,

18 14.)

19

Plaintiff's comments raised concerns with the City Manager, Michael Matthias, that

20 Plaintiff was directing money to DMLF instead of the City, cash handling, and engaging in an

21 apparent effort to "manage and/or direct public finances separate from City administration."

22 (Dkt. No. 36 at 2-3.)

23

24

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT - 2

On June 1, 2018, Plaintiff was informed that following her retirement, Wesley Homes, a private housing organization, would be taking over management of the senior center. (Dkt. Nos. 36 at 3; 41-1 at 25-27.)  Plaintiff opposed this decision and stated that Mr. Matthias demanded that she "back [his] plan or else." (Dkt. Nos. 1-1 at 12-13; 41-1 at 26; 48-1 at 17-18, 20, 22-23.)

On June 11, 2018 the City retained consulting firm Alvarez & Marsal ("A&M") to investigate the actions of certain employees as they related to DMLF and to examine DMLF's accounts to determine if any donations or funds intended for the City had been unlawfully diverted. (Dkt. Nos. 36 at 3-4; 38 at 2-3; 38-3 at 2-8.)  Shortly thereafter, the City's attorney, Tim George, notified the State Auditor's Office that a loss of public funds or assets or other illegal activity may have occurred. (Dkt. Nos. 38 at 3; 38-4 at 2.)

Plaintiff stated that on June 12, 2018, she received a phone call from the president of DMLF letting her know that the City was planning to "come in and confiscate everything" belonging to DMLF. (Dkt. No. 48-1 at 40.)  Plaintiff testified that this was the impetus for her and another city employee, Patrice Thorell, to start boxing up DMLF files. (*Id.*)

On June 13, 2018, the City's information technology manager, Dale Southwick, received the following voicemail message from Plaintiff:

> We got word that the City is planning on coming in here and confiscating everything about the Des Moines Legacy Foundation so I'm boxing like crazy. Could you please delete the scanned folder—Des Moines Legacy Foundation - on our copier please? I don't know how to do that. Or if you're not comfortable with that, could you please call me and tell me how to delete the Des Moines Legacy Foundation scanned folder.

(Dkt. Nos. 2-1 at 13-14; 2-7 at 41; 44 at 1-2; 48-1 at 39-40; 48-2 at 1.)

Mr. Southwick stated that he felt uncomfortable with Plaintiff's request and was concerned that Plaintiff was asking him to delete public records without following City protocols. (Dkt. No. 44 at 1.)  Mr. Southwick notified Mr. George about Plaintiff's message. (*Id.*)

On June 13, 2018, at Mr. George's request, Mr. Southwick reviewed the City's network and found that several folders had been deleted from the City's network between June 12th and June 13th. (Dkt. Nos. 44 at 1-2; 44-1 at 2-5; 44-2 at 2-3.)  Mr. Southwick stated the drive in question was accessible to all PRSS staff, and that he does not recall being asked to determine who deleted the folders, but commented that "it was assumed that Sue Padden had done so." (Dkt. No. 44-2 at 3.)

On June 14, 2018, following a special City Council meeting, Mr. Matthias and City Clerk Bonnie Wilkins met privately with Plaintiff. (Dkt. Nos. 36 at 4; 39 at 3-4; 41-1 at 106.)  At that meeting, Mr. Matthias handed Plaintiff a memorandum informing her that she was being placed on paid administrative leave pending the outcome of an investigation into Plaintiff's suspected violations of state law and certain provisions of the City's personnel manual. (Dkt. Nos. 36 at 4-5; 36-4 at 2-5.)

Following this meeting, Mr. Matthias and Ms. Wilkins drove to the senior center, where Plaintiff's office was located, and stood near the front entrance while Plaintiff removed her belongings from her office and took them to her car. (Dkt. Nos. 36 at 4; 39 at 4.)  At a June 14, 2018 city council meeting, Mr. Matthias made the following statement:

> As public servants -- servants, the most significant responsibility of City Council and City -- City staff is to safeguard the public trust, protect your hard earned tax dollars, and assure that precious resources are spent the most efficient and impactful manner as possible. Anything or anyone that encroaches on that public trust must and will be dealt with no matter what.
>
> Last week, public concerns were voiced about the apparent lack of transparency over recent Administrator and Council decisions. The community has made it clear to me that they wanted more communication and input, and so I am providing this update on a relevant issue tonight.
>
> The City has been in the process of an investigation for a number of weeks now, which is still ongoing, to assist in the current transition at the Senior Center. The City retained a third party expert to review and provide recommendations regarding

1
2

the City's relationship with the nonprofit that provides support for the City. Accordingly, we began – began compiling electronic records that were on the City's server to assist in the review.

3
4
5
6

Yesterday, it was confirmed that a City employee was acting in a way to compromise that investigation; specifically, deleting large number of files from the City server. These actions put the City at great risk. As a result, action was taken today to limit the access of this employee to City files and facilities, pending the outcome of a further investigation. While documents were deleted, those documents have been fully recovered and have been made available to our third party investigator.

7
8
9
10

Given what we have discovered so far, I have contacted the State Auditor's office, as required by law, and they will be completing their own investigation. I can provide updates to the Council as needed. However, at this point, the matter is being investigated by outside parties, and it is appropriate that they be allowed to complete their investigations without further delay or interference. In the spirit of transparency, this is all myself, staff, and City council can say about this at this time. Thank you.

11

(Dkt. Nos. 2-7 at 36; 2-11 at 13; 36-5 at 2-7.)

12

Plaintiff appeared and spoke at a June 28, 2018 meeting of the City Council and provided

13

members of the council with a June 20, 2018 letter she received from the City attorney asking

14

her to return any documents she removed from City facilities, along with a copy of her written

15

response to his request. (Dkt. Nos. 38-13 at 2-3; 41-1 at 128; 48-2 at 4-5, 43-44.)  Plaintiff

16

remained on administrative leave, and retired as scheduled on June 29, 2018. (Dkt. Nos. 41-1 at

17

3, 25; 48-1 at 3, 8; 48-2 at 4.)

18

On July 2, 2018, Mr. Matthias provided an additional statement to a journalist, which was

19

published on a local blog:

20
21
22

In response to certain statements and questions that have been circulating and were brought forward at a recent City Council meeting, I offer this letter to clarify what I am able to and to explain why it is not appropriate to fully discuss certain aspects of our investigation at this time.

23

The first point I would like to make is that the Legacy Foundation is not under investigation by the City or our hired investigators. I have repeatedly voiced my

24

support for the foundation and the work that they have done and I continue to feel this way.

The city is reviewing the actions of specific city employees, and some of those actions include their interactions and involvement with the Legacy Foundation. The basis for this review was partially mentioned during public comment at the City Council meeting however, additional information exists that is not publicly known and that cannot be disclosed at this time, due to the on-going investigation.

With regard to the internal review, the City of Des Moines, like any public agency, is a steward of the public trust and of taxpayer dollars. In this role, the city has a moral, financial, and legal duty to protect this trust. Any time the city is made aware of a possible violation of these duties, we are obligated to investigate and determine whether inappropriate actions have been taken. In order to avoid an appearance of a conflict of interest or of bias, it is routine for cities to obtain a third party to conduct fact finding reviews and to provide appropriate recommendations and findings.

What I can disclose at this time is that the city retained a third party consultant to conduct an internal investigation into concerns related to financial matters and whether funds that were intended for the city were being diverted elsewhere by city employees. Almost immediately after this consultant was hired, the city became aware that an employee was deleting a large number of electronic records that related to the subject of the investigation.

Additionally, the city obtained an audio recording of the employee which confirmed that they had deleted electronic records and were boxing records related to the investigation in order to remove them from city buildings. After learning of these actions, the employee was placed on administrative leave and their access to city facilities and the city's network was restricted. As of this date, the employee no longer works for the City of Des Moines.

Any time a city begins an investigation of this sort, the hope is that no wrongdoing will be found, that has never been truer than it is now. For this reason, it would be inappropriate and premature to disclose anything further at this early point in the investigation. No findings or conclusions regarding the initial focus of the internal investigation have been made at this point and the review is on-going.

We will disclose more information when the investigation is complete.

(Dkt. Nos. 2-7 at 38-39; 2-11 at 15-16; 36-6 at 2.)

Between June and August 2018, A&M continued its investigation, requesting a range of documents from DMLF. (Dkt. Nos. 38-14 at 2-4; 41-3 at 30-31, 39-40, 42-43, 101-02.)

1       A&M issued its report on November 13, 2018, concluding that, based on their review, it

2 was "apparent that former City employees, who were also board members of DMLF, had the

3 preference for funds intended for the benefit of the City to go to DMLF because they could

4 control the use of the funds." (Dkt. No. 38-5 at 16.)  A&M identified instances where donations

5 made payable to the City were deposited into DMLF's bank account, and further concluded that

6 a large percentage of the funds received by DMLF did not directly benefits the City's Parks,

7 Recreation and Senior Services Department or its programs. (*Id.*)  A&M presented its findings

8 during a City Council meeting on November 15, 2018. (Dkt. Nos. 37-5 at 2-22; 39-4 at 2-12.)

9       In October or November 2018, and based on a recommendation by the King County

10 Prosecutor's Office, the City's attorney and the Des Moines Police Chief Ken Thomas referred

11 the matter to an outside law enforcement agency, the Issaquah Police Department ("IPD"), for

12 investigation of any potential criminal activity related to handling of City funds and/or public

13 records. (Dkt. Nos. 37-6 at 11; 38-6 at 2, 6.)  In February 2019, King County Superior Court

14 Judge David Keenan signed two warrants drafted by IPD for DMLF's bank records. (Dkt. No.

15 38-6 at 13; 38-7 at 2-27.)

16       On April 18, 2019, City Manager Matthias appointed a Special Prosecutor, Nelson Lee,

17 to assist the City in its investigation. (Dkt. No. 38-9 at 2.)

18       On May 15, 2019, IPD finished its investigation, concluding that it was "apparent that

19 money intended to go to the City of Des Moines was diverted to the DMLF" but noting that the

20 King County Prosecutor's Office declined to file felony theft charges related to this diversion of

21 funds. (Dkt. No. 38-6 at 22.)  IPD further concluded that Plaintiff may have violated the law by

22 deleting public records, but again noted that the King County Prosecutor's Office was declining

23 to prosecute. (*Id.*) Special Prosecutor Lee also declined to file to charges. (Dkt. No. 39-5 at 18.)

24

1    A&M issued an updated report on July 1, 2019, which concurred with IPD's finding that

2    there were instances where "donations made payable to the City were deposited into the DMLF's

3    bank account." (Dkt. No. 38-8 at 3, 6.)  A&M again concluded that while there was no evidence

4    that any diversion of funds from the City to DMLF was done for personal financial gain, it was

5    apparent that former City employees, who were also board members of DMLF, "had the

6    preference for funds intended for the benefit of the City go to DMLF because they could control

7    the use of the funds." (*Id.* at 4-5.)

8    On July 31, 2019, Special Prosecutor Lee sent Plaintiff's attorney a letter offering

9    Plaintiff an opportunity to explain her actions. (Dkt. No. 38-10 at 2.)  On September 10, 2019,

10   Plaintiff's attorney declined this offer on her behalf, stating that Plaintiff was not given the

11   opportunity to tell her side of the story before she was placed on administrative leave, and that

12   given the investigations conducted since then, Plaintiff's "ability to protect her reputation has

13   ended and that door has now closed." (*Id.* at 3.)  Plaintiff also declined an opportunity to speak

14   with the Des Moines Police Department. (*Id.* at 5.)

15   On September 13, 2019 City Attorney Tim George sent a letter to DMLF informing them

16   that the City's investigation was complete, and that the City was seeking to recoup more than

17   $94,000.00 in losses. (Dkt. No. 38-11 at 2-3.)  The City provided an update on the investigation

18   during a council meeting on October 10, 2019, and announced that it was ending its

19   investigation. (Dkt. Nos. 2-7 at 45, 59, 61; 2-10 at 4, 18, 20; 39-5 at 2-19.)  On October 12, 2019,

20   DMLF issued a statement denying all allegations of wrongdoing and asserting that the City's

21   criminal probe was improper. (Dkt. Nos. 2-7 at 61; 2-10 at 20.)

22

23

24

1       An attorney for DMLF responded to the City's demand for restitution on November 6,

2  2019. (Dkt. No. 41-3 at 90-92.)  On November 10, 2019, the Des Moines City Council held

3  another meeting to update the public on the status of its investigation. (Dkt. No. 37-6 at 3-16.)

4       The Washington State Auditor's Office released a report on December 4, 2020 finding

5  that the City had inadequate internal controls and a lack of proper oversight that allowed 33

6  checks, totaling $8,140, made out to the City to be deposited into a DMLF bank account. (Dkt.

7  No. 38-12 at 8.)  DMLF responded to the Auditor's report on December 5, 2020. (Dkt. No. 41-3

8  at 83-84.)

9       Plaintiff filed a complaint against the City of Des Moines and Michael Matthias in King

10  County Superior Court on May 15, 2020. (Dkt. No. 1-1 at 1-28.)  Plaintiff brought several claims

11  against the City and Mr. Matthias, including: 1) Violation of the First Amendment pursuant to 42

12  U.S.C. § 1983, 2) Defamation, 3) Intentional and/or Negligent Infliction of Emotional Distress,

13  4) Retaliation, 5) Hostile Work Environment, 6) Age and Gender Bias, and 7) Violations of her

14  rights under the Fourth and Fourteenth Amendment pursuant to 42 U.S.C. § 1983. (Dkt. No. 1-1

15  at 22-26.) Plaintiff's complaint was removed to this Court on June 3, 2020. (Dkt. No. 1 at 1-2.)

16       Plaintiff later withdrew her claims under the Fourth and Fourteenth Amendments, along

17  with her claim of age and gender bias. (Dkt. Nos. 41 at 15, 17-18; 48-2 at 3.)

## II.     STANDARD OF REVIEW

19       Summary judgment is appropriate where "the movant shows that there is no genuine

20  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

21  Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986). Material facts are those

22  which might affect the outcome of the suit under governing law. *Id.* at 248. In ruling on summary

23  judgment, a court does not weigh evidence to determine the truth of the matter, but "only

1   determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549

2   (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747

3   (9th Cir. 1992)).

4          On a motion for summary judgment, the court views the evidence and draws inferences

5   in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S.*

6   *Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable

7   inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, rev'd on

8   other grounds, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient

9   showing on an essential element of her case with respect to which she has the burden of proof" to

10  survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

11         While it is sufficient for the Plaintiff to establish that there is a genuine dispute

12  concerning a material fact, once the moving party has carried its burden under Federal Rule of

13  Civil Procedure 56, the party opposing the motion "must do more than simply show that there is

14  some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*,

15  475 U.S. 574, 586 (1986). The opposing party cannot rest solely on her pleadings but must

16  produce significant, probative evidence in the form of affidavits, and/or admissible discovery

17  material that would allow a reasonable jury to find in her favor. *Id.* at n.11; *Anderson v. Liberty*

18  *Lobby, Inc*., 477 U.S. 242, 249-50 (1986).

19         The nonmoving party "must produce at least some 'significant probative evidence

20  tending to support the complaint.'" *Id.; see also California Architectural Building Products, Inc.*

21  *v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir. 1987). ("No longer can it be argued

22  that any disagreement about a material issue of fact precludes the use of summary judgment.").

23

24

1   "If a party fails to properly support an assertion of fact or fails to properly address

2   another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary

3   judgment if the motion and supporting materials--including the facts considered undisputed--

4   show that the movant is entitled to it[.]" Fed R. Civ. P. 56(e)(3).

### III.    DISCUSSION

### A.    First Amendment Claim under the Federal Constitution[1]

Plaintiff contends that Defendant retaliated against her based on her "criticism and

activism in opposition to the outsourcing of the Senior Center to Wesley Homes" by publicly

humiliating her and "ensuring that numerous people knew she had been placed on leave on

suspicion of theft of public records and of money owing to the City." (Dkt. Nos. 1-1 at 24; 41 at

13-15.)

Although public employees "do not shed their First Amendment rights simply because

they are employed by the government," courts considering a claim such as Plaintiff's must

carefully balance "the interests of the public employee, as a citizen, in commenting upon matters

of public concern and the interest of the State, as an employer, in promoting the efficiency of the

public services it performs through its employees." *Brownfield v. City of Yakima*, 612 F.3d 1140,

1147 (9th Cir. 2010) (quoting *Huppert v. City of Pittsburg*, 574 F.3d 696, 702 (9th Cir.2009).

In evaluating a First Amendment retaliation claim brought by a public employee, the

Court must employ a sequential five step test, considering:

(1) whether the Plaintiff spoke on a matter of public concern; (2) whether the
Plaintiff spoke as a private citizen or public employee; (3) whether the Plaintiff's
protected speech was a substantial or motivating factor in the adverse employment

---

[1] Plaintiff's § 1983 claim is based on her First Amendment retaliation claim and necessarily fails
if her First Amendment retaliation claim fails. Plaintiff also acknowledges her § 1983 claim
based on the Fourteenth Amendment is not viable (Dkt. No. 41 at 15) and offers no argument in
her Opposition as to a § 1983 claim based on the Fourth Amendment.

action; (4) whether the [City] had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the [City] would have taken the adverse employment action even absent the protected speech.

*Coomes v. Edmonds Sch. Dist. No. 15,* 816 F.3d 1255, 1259 (9th Cir. 2016) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)). Plaintiff bears the burden on the first three questions and Defendant bears the burden on the last two. *Greisen v. Hanken,* 925 F.3d 1097, 1108 (9th Cir. 2019). "[F]ailure to meet any one of [these factors] is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc).  Accordingly, "it may be more efficient in some instances to answer a potentially dispositive question further down the *Eng* list first." *Id.*

Even assuming the plaintiff has met her burden regarding the first three factors, the fourth and fifth prongs of the *Eng* test are dispositive.  The fourth prong requires Defendants to establish that the city's "legitimate administrative interests outweigh the employee's First Amendment rights." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004).  This inquiry asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2005).

As to the fifth prong, the government bears the burden of demonstrating that it "would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct." *Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009) (internal citations omitted).  That is, the City must successfully establish that it "would have made the same employment decisions even absent the questioned speech." *Id.*

This "but-for causation inquiry" called for by the fifth prong of the *Eng* test is "purely a question of fact." *Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009). To resolve the fifth prong

1   in Defendant's favor on summary judgment, Defendants must produce "conclusive evidence"

2   that Plaintiff's unprotected behavior was the but-for cause of the adverse employment action in

3   question. *Anthoine v. North Central Counties Consortium*, 605 F.3d 740, 752 (9th Cir. 2009).

4        Here, Defendants argue persuasively that the City had a legitimate interest, and to some

5   extent an obligation, in investigating and reporting on "potential criminal and financial

6   malfeasance impacting public funds and property" and that it would have taken the same actions

7   against Plaintiff even in the absence of Plaintiff's protected speech. (Dkt. Nos. 34 at 15; 38 at 2-

8   3.)  They also persuasively argue that Plaintiff would have been placed on administrative leave,

9   and her conduct and that of DMLF would have been subject to investigation, even absent her

10  opposition to the outsourcing of certain PRSS functions.

11       These arguments are persuasive because there is no dispute that Plaintiff's succession

12  notes described encouraging donors to send donations to DMLF rather than to the City. (Dkt.

13  Nos. 36 at 2-3; 36-3 at 3-5, 10, 12, 14.)  Those notes also advised any donations larger than fifty

14  dollars ($50) go to DMLF and not the City. (*Id.*)  There is no dispute that on June 13, 2018, after

15  learning the City was reviewing the relationship between DMLF and the City, Plaintiff left a

16  voicemail wherein she requested the deletion of electronic files and stated she was "boxing like

17  crazy" various documents related to DMLF. (Dkt. Nos. 2-1 at 13-14; 2-7 at 41; 44 at 1-2; 48-1 at

18  39-40; 48-2 at 1.)  There also is no dispute that a review of the City's network on June 13, 2018

19  identified that someone had deleted several folders between June 12th and June 13th. (Dkt. Nos.

20  44 at 1-2; 44-1 at 2-5; 44-2 at 2-3.)

21       Given these undisputed facts, a reasonable jury would conclude that the City had a

22  legitimate administrative interest in conducting an investigation regarding the potential

23  misappropriation of City property and the potential deletion of electronic records, and that such

24

1    interest outweighed any First Amendment right Plaintiff had related to her criticism of the

2    outsourcing of the senior center's management to Wesley Homes.  In addition, a reasonable jury

3    would conclude the decision to place Plaintiff on administrative leave would have occurred

4    regardless of any statements she made about the senior center's management.

5        Plaintiff, therefore, has not established that Defendants deprived Plaintiff of a

6    constitutional right, and Defendants are entitled to summary judgment as to Plaintiff's First

7    Amendment claim.

8        **B.      Defamation**

9        Under Washington state law, a defamation action consists of four elements: (1) a false

10   statement [about the plaintiff], (2) publication, (3) fault, and (4) damages." *Duc Tan v. Le*, 300

11   P.3d 356, 363 (Wash. 2013).

12       A plaintiff can allege the false statement prong by alleging facts showing that the

13   statement is provably false or "leaves a false impression due to omitted facts." *See Yeakey v.*

14   *Hearst Commc'ns, Inc*., 234 P.3d 332, 335 (Wash. Ct. App. 2010) (citing *Mohr v. Grant*, 108

15   P.3d 768, 773 (Wash. 2005)). "Defamation by implication occurs when 'the defendant

16   juxtaposes a series of facts so as to imply a defamatory connection between them.'" *Corey v.*

17   *Pierce Cty*., 225 P.3d 367, 373 (Wash. Ct. App. 2010) (quoting *Mohr*, 108 P.3d at 774).

18       Defamatory meaning may not be imputed to true statements, or to opinion-like

19   characterizations of plaintiff's actions. *Lee v. Columbian, Inc*., 826 P.2d 217, 219-20 (Wash. Ct.

20   App. 1991); *Robel v. Roundup Corp*., 148 Wash.2d at 55, 59 P.3d 611 (2002). Courts give words

21   their "natural and obvious meaning" and may not extend the language by "innuendo or by the

22   conclusions of the pleader." *Lee*, 826 P.2d at 219. The "defamatory character of the language

23   must be apparent from the words themselves."  *Id.*

24

1    Further, Washington law does not require proof of the literal truth of every allegedly

2    defamatory statement.  *Mohr v. Grant*, 108 P.3d 768, 775 (Wash. 2005).  Rather, "[a] defendant

3    need only show that the statement is substantially true or that the gist of the story, the portion

4    that carries the 'sting,' is true."  *Id.* (quoting *Mark v. Seattle Times*, 635 P.2d 1081, 1092 (Wash.

5    1981)).

6    The court, not the jury, determines the "sting" of a report.  *Id.*  "The 'sting' of a report is

7    defined as the gist or substance of a report when considered as a whole."  *Id.* (quoting *Herron v.*

8    *King Broad.*, 776 P.2d 98, 102 (Wash. 1989)).  "Where a report contains a mixture of true and

9    false statements, a false statement (or statements) affects the 'sting' of a report only when

10   'significantly greater opprobrium' results from the report containing the falsehood than would

11   result from the report without the falsehood."  *Herron*, 776 P.2d at 102.

12       1.  Mr. Matthias' June 14, 2018 Statements at City Council Meeting.

13   Plaintiff contends that it is the totality of Mr. Matthias' statements at the June 14, 2018

14   City Council meeting, along with other unspecified comments by Mr. Matthias and other City

15   employees, that constitutes defamation.  (Dkt. No. 41 at 16-18.)  Plaintiff contends that

16   Defendants did not use conditional language in describing Plaintiff's alleged conduct, and that

17   while Mr. Matthias did not name Plaintiff during his remarks, his statements could only have

18   referred to her.  (*Id.* at 16-17.)

19   The gist of Mr. Matthias' June 14, 2018 statement is that there was an ongoing

20   investigation to assist in the transition at the senior center; that a city employee was acting to

21   compromise that investigation; and that action was taken to limit that employee's access to city

22   files and facilities.  A review of the entire statement leads to the conclusion that the real "sting"

23

24

1   of the statement was that an investigation was occurring, and an employee took steps to hinder

2   the investigation.

3          While there is no evidence Plaintiff in fact deleted files from the City's server[2], the

4   undisputed facts show Plaintiff sought to box up files and sought the deletion of certain

5   electronic files by requesting their removal from a copier.  Thus, incorrectly stating Plaintiff

6   deleted files from a server resulted in no "significantly greater opprobrium" because it remained

7   substantially true that an employee's actions appeared aimed at compromising an ongoing

8   investigation.

9          Therefore, the June 14, 2018 statement cannot be considered a "false statement" for

10  purposes of Plaintiff's defamation claim.

11         2.   Mr. Matthias' July 2, 2018 Statements.

12         Plaintiff asserts Mr. Mathias' July 2, 2018 statement is defamatory because it: 1) only

13  could have been referring to Plaintiff or Ms. Thorell (Dkt. Nos. 41-1 at 25; 48-2 at 13); 2) was

14  made before speaking with Plaintiff (Dkt. Nos. 38-10 at 2-3; 48-2 at 13-14); 3) falsely stated

15  DMLF was not under investigation (Dkt. No. 48-2 at 12-13); 4) implied that Plaintiff was aware

16  of the investigation prior to allegedly deleting the electronic records (Dkt. No. 48-2 at 14); and 5)

17  implied that the City employee under investigation for deleting files was terminated.  (Dkt. No.

18  1-1 at 22-23; 41-1 at 25.)

19

20

21  [2] The Court notes that Plaintiff did copy onto a thumb drive DMLF files from the City computer

22  she normally used and then deleted those files from the City computer.  (Dkt. No. 37-1 at 34-37.)
    This did not have the effect of deleting files from the City's server, but Plaintiff appeared to

23  acknowledge such conduct is what Mr. Mathias' may have been referring to.  (Dkt. No. 37-1 at
    34.)  The exact date the City learned of the removal and deletion of DMLF files from Plaintiff's

24  computer is uncertain from the record provided.

Notwithstanding Plaintiff's assertions, and as identified previously, the issue is whether the gist of the July 2, 2018 statement—the portion of the statement that carries the sting—was true.

The July 2, 2018 statement is comprised of eight paragraphs (or seven paragraphs and one sentence). The first is an introductory statement about the reason for making the public comment. The second states DMLF is not under investigation while the third states the City is reviewing interactions between certain city employees and DMLF. The fourth and beginning of the fifth paragraph identify that an outside consultant was contracted. The second part of the fifth identifies that after the consultant was hired, the City learned an employee had deleted records that were subject of the investigation. The sixth paragraph noted the City had an audio recording "which confirmed [the employee] had deleted electronic records and were boxing records related to the investigation in order to remove them from city buildings." It also identified the employee had been placed on administrative leave and was no longer working for the City. The seventh and eighth paragraphs indicate the investigation was ongoing.

Having reviewed the entire statement, the Court concludes that the "gist" of the July 2, 2018 statement was that the investigation into interactions between city employees and DMLF was on-going. The sting continued to be that an employee was placed on administrative leave because the employee had allegedly taken steps to frustrate that investigation.

While it could be argued that the July 2, 2018 contained incorrect information (such as DMLF not being under investigation or that the City did not have evidence that the employee placed on administrative leave was in fact the one who had deleted electronic records from the

City's server[3]), it remained substantially true that an employee had been placed on administrative leave because of what appeared to be questionable conduct aimed at frustrating an investigation.

This is because it is undisputed that Plaintiff was placed on administrative leave after she left a voicemail requesting the deletion of electronic files and admitted she was "boxing like crazy" various documents related to DMLF.  It also remained true that the employee was no longer working for the City, because in fact, Plaintiff was no longer working for the City as of July 2, 2018.

In short, even with any of the alleged incorrect information, the July 2, 2018 statement did not result in any "significantly greater opprobrium" as the gist or the sting of the July 2, 2018 statement—that an employee was placed on administrative leave because of questionable conduct—remained substantially true.  The July 2, 2018 statement, therefore, does not support Plaintiff's defamation claim.

    3.  <u>Police Chief October 10, 2019 Statements.</u>

Plaintiff also alleges that at the October 10, 2019 meeting of the City Council, the Des Moines Police Chief stated or implied that she had committed a felony. (Dkt. No. 48-3 at 7.)  She notes that an unattributed PowerPoint slide from the October 10, 2019 city council meeting stated that "although crimes were committed, evidentiary issues exist that would make prosecution difficult." (Dkt. No. 39-5 at 18.)

While no charges were ultimately brought, the statement in the PowerPoint slide that crimes were committed appeared to be substantially true because it accurately reflected the findings of the Special Prosecutor and the IPD who concluded that, among other things, the

---

[3] Again, Plaintiff did acknowledge she deleted files from her work computer after those files were copied onto a thumb drive.

1    deletion of public records would constitute a crime.  (Dkt. Nos. 37-6 at 14-15; 38-6 at 22.)  There

2    is no indication that Plaintiff challenges this basic conclusion.

3         Thus, even if statements made at the October 10, 2019 meeting implied Plaintiff had

4    committed a felony, the Court is unable to conclude that the reiteration of the conclusions

5    reached by the Special Prosecutor and IPD at said meeting were false for purposes of Plaintiff's

6    defamation claim.

7         In summary, even when viewing the facts in the light most favorable to Plaintiff, Plaintiff

8    cannot establish that the statements of Mr. Matthias or any other City employee were false as

9    required for a defamation action under Washington law.

10        **C.        Intentional and/or Negligent Infliction of Emotional Distress**

11             1.   Intentional Infliction of Emotional Distress Claim.

12        Under Washington state law, a claim for intentional infliction of emotional distress

13   (outrage), consists of three elements: "(1) extreme and outrageous conduct; (2) intentional or

14   reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional

15   distress." *Rice v. Janovich*, 742 P.2d 1230, 1238 (Wash. 1987); Restatement (Second) of Torts §

16   46 (1965).

17        The conduct in question must be "so outrageous in character, and so extreme in degree,

18   as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

19   intolerable in a civilized community." *Dicomes v. State*, 782 P.2d 1002, 1012–13 (Wash. 1989)

20   (citing *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)). The question of whether certain

21   conduct is sufficiently outrageous is ordinarily for the jury, but it is initially for the court to

22   determine if reasonable minds could differ on whether the conduct was sufficiently extreme to

23   result in liability. *Id.*

24

Moreover, "The mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; "there must be evidence on which the jury could reasonably find for the [party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Here, Plaintiff's emotional distress claim stems from Mr. Matthias' conduct on June 14, 2018 after he handed Plaintiff a memorandum informing her that she was being placed on administrative leave.[4] After Plaintiff received the memorandum, Mr. Matthias and Ms. Wilkins drove to the senior center, where Plaintiff's office was located, and stood near the front entrance while Plaintiff removed her belongings from her office and took them to her car. (Dkt. Nos. 36 at 4; 39 at 4.)

Plaintiff contends that this occurred while residents at the senior center were eating lunch, and that she passed the senior lunch tables as she was moving her belongings from her office to her car. (Dkt. Nos. 41-1 at 24-25, 114-16.)  Plaintiff stated that she was not physically removed from the senior center, but that she felt Mr. Matthias deliberately set out to humiliate her and that she was "frog marched emotionally" out of the building. (Dkt. No. 48-2 at 6-7.)

Plaintiff argues that Matthias failed to orchestrate her departure from the senior center in a way "that would not reveal or add to [Plaintiff's] disquiet", stood by and made her "traipse through the Senior Center on her own" and should have arranged for Plaintiff to pack up her belongings at a different hour if he did not want to be subjected to the "histrionics that he knew would follow." (Dkt. No. 41 at 21-22.)

---

[4] To the extent Plaintiff's emotional distress claim is based on Defendants' alleged defamatory statements, her claim would fail because an emotional distress claim is not recognized as a cause of action independent of the defamation claim. *See supra* Section III.B; *Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 893 n. 4 (9th Cir.1988).

A review of the record indicates Mr. Matthias' actions on the day Plaintiff was placed on administrative leave consisted of him standing near the entrance of the senior center during the lunch hour while Plaintiff removed her belongings.  He stood and watched Plaintiff as she interacted with various individuals and carried out personal items.  Plaintiff was very emotional that day and upset about the timing of when she was asked to obtain her belongings as well as Mr. Mathias being present rather than a person from the Human Resources department. However, other than Plaintiff's description of Mr. Matthias' demeanor, the record is void of Mr. Mathias' doing or saying anything inappropriate in front of any of the individuals present.

Without more, Plaintiff's description of Mr. Mathias' demeanor, or the timing of when she was asked to remove her belongings, is insufficient for a reasonable jury to find that Mr. Mathias' actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Dicomes*, 782 P.2d at 1012–13.

2.   Negligent Infliction of Emotional Distress Claim.

In Washington, to plead a negligent infliction of emotional distress claim, a plaintiff must show: (1) that her employer's negligent acts injured her, (2) the acts were not a workplace dispute or employee discipline, (3) the injury is not covered by the Industrial Insurance Act, and (4) the dominant feature of the negligence claim was the emotional injury. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 972 (9th Cir. 2002) (quoting *Snyder v. Med. Serv. Corp. of E. Wash.*, 988 P.2d 1023, 1028 (Wash. Ct. App. 1999)). A plaintiff must also allege "objective symptomology"—that her emotional distress is "susceptible to medical diagnosis and prov[able] through medical evidence." *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 205 (Wash. 2014) (quoting *Hegel v. McMahon*, 960 P.2d 424 (Wash. 1998)).

1    "There is no duty for an employer to provide employees with a stress free workplace."

2    *Snyder v. Med. Serv. Corp. of E. Washington*, 35 P.3d 1158, 1164 (Wash. 2001). "[E]mployers

3    do not owe employees a duty to use reasonable care to avoid the inadvertent infliction of

4    emotional distress when responding to workplace disputes." *Id.* (quoting *Bishop v. State*, 889

5    P.2d 959, 963 (Wash. Ct. App. 1995)).

6        Here, Defendant's alleged negligent conduct occurred in the context of a workplace

7    dispute, namely Plaintiff's placement on administrative leave, and while Plaintiff has described

8    her subjective emotional response to being placed on administrative leave, she has not presented

9    any evidence establishing that her emotional distress is susceptible to medical diagnosis and

10   provable through medical evidence. (Dkt. No. 41-1 at 28-30.)

11       Accordingly, Defendant is entitled to summary judgment on Plaintiff's infliction of

12   emotional distress claims.

13   **D.    Retaliation**

14       To establish a prima facie case of retaliation under the Washington Law Against

15   Discrimination ("WLAD") a plaintiff must establish that: (1) she participated in a statutorily

16   protected activity; (2) an adverse employment action was taken against her; and (3) retaliation

17   was a substantial factor behind the adverse employment action. *City of Seattle v. American*

18   *Healthcare Services, Inc.*, 468 P.3d.637, 649 (Wash. Ct. App. 2020) (internal citations omitted).

19   A "substantial factor" must be a significant motivating factor, but need not be the sole factor, or

20   even a determining factor, in the decision. *Id.*

21       As discussed above in the context of Plaintiff's First Amendment claim, Plaintiff

22   contends that Defendant retaliated against her because of opposition to the outsourcing of the

23   senior center to Wesley Homes by publicly humiliating her and ensuring that numerous people

24

knew she had been placed on leave on suspicion of theft of public records and misappropriation of City funds. (Dkt. Nos. 1-1 at 20-21, 24; 41 at 13-15.)

Plaintiff contends that during her meeting with Mr. Matthias to discuss the planned transfer of the senior center's management to Wesley Homes, Matthias acted in an "angry manner", stated that Plaintiff had "been busy", and threatened Plaintiff that if she did not back off and support his plan "she would be terminated, or words to that effect." (Dkt. No. 1-1 at 12-13.)  Defendant Matthias denies that he threatened Plaintiff, and stated that during his June 4, 2018 with Plaintiff he told her that he expected Plaintiff to carry out policy decisions by the City Council and City administration, even if she disagreed with them. (Dkt. No. 36 at 3.)

Here, Plaintiff's allegations concerning Defendants' motives for placing her on administrative leave appear to be speculative because they are based solely on her description of Mr. Matthias' demeanor and her uncorroborated assertion that Mr. Matthias threatened her. Absent more, a reasonable jury would be unable to conclude retaliation was a substantial factor in placing Plaintiff on administrative leave when it is undisputed that the City was investigating potentially inappropriate conduct.  As previously identified, it is undisputed that Plaintiff's succession notes described encouraging donors to send donations to DMLF rather than to the City; that after learning the City was reviewing the relationship between DMLF and the City, Plaintiff left a voicemail requesting the deletion of files; and that a review of the City's network on June 13, 2018 identified that someone had deleted several folders between June 12th and June 13th. *See supra* Section III.A.

Therefore, Plaintiff has failed to establish that there is a genuine issue of material fact remaining regarding her retaliation claim, and Defendant is entitled to summary judgment.

1   **E.      Hostile Work Environment**

2      Under Washington law, to establish a prima facie case for a hostile work environment

3   claim, a plaintiff must show that: (1) he or she was subjected to unwelcome hostile or abusive

4   conduct, (2) the conduct was based on the plaintiff's protected status, (3) the conduct was

5   sufficiently severe to affect the terms and conditions of employment and create an abusive

6   working environment, and (4) the hostile or abusive conduct is imputable to the employer. *See*

7   *Glasgow v. Georgia-Pacific Corp.*, 693 P.2d 708, 711–12 (Wash. 1985).

8      "[I]solated or trivial manifestations of a discriminatory environment" are insufficient to

9   state a cause of action under Washington law. *Id.* To determine whether the conduct was

10   sufficiently pervasive as to alter the conditions of employment and create an abusive working

11   environment, courts consider the totality of the circumstances, including frequency and severity

12   of the alleged conduct, whether the conduct involved words alone or also included physical

13   intimidation or humiliation, and whether the conduct interfered with the employee's work

14   performance. *Adams v. Able Bldg. Supply, Inc.*, 57 P.3d 280, 283 (Wash. Ct. App. 2002) (citing

15   *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993); *Glasgow*, 693 P.2d at 712; *MacDonald v.*

16   *Korum Ford*, 912 P.2d 1052, 1058 (Wash. Ct. App. 1996)).

17      For the reasons discussed above in connection with Plaintiff's defamation, emotional

18   distress and retaliation claims, Plaintiff has not established that she was subjected to "hostile or

19   abusive" conduct sufficient to sustain a hostile workplace claim; as such, Defendant is entitled to

20   summary judgment.

21   **F.      Privileges and Immunities**

22      Defendants argue that several privileges and immunities bar Plaintiff's claims. (Dkt. No.

23   34 at 13, 19-22; 35 at 5-7.)  The Court need not address this question because Plaintiff has not

24

established that Defendants violated her federal constitutional rights or that there remains a genuine question of material fact related to her claims arising under state law.

**IV.   ORDER**

Having considered Defendants' motions, Plaintiff's Response, Defendants' Replies, the exhibits and declarations attached thereto, and the remainder of the record, the Court finds and ORDERS:

(1) Defendants' motions for summary judgment (Dkt. Nos. 34 and 35) are GRANTED.

(2) Plaintiff's motions in limine (Dkt. No. 51) and all other pending motions are STRICKEN as moot.

(3) This case is DISMISSED WITH PREJUDICE; and

The Clerk is directed to send copies of this Order to the parties and to close the case.

Dated this 7th day of December, 2021.

David G. Estudillo
United States District Judge